ADVANCED MICRO DEVICES, Data General Corporation, Electronic Memories & Magnetics Corporation, Hewlett-Packard Co., Intel Corporation, Mostek Corporation, National Semiconductor Corporation, RCA Corporation, Rockwell International and Signetics Corporation, Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Flying Tiger Line, Inc., Intervenor.

ADVANCED MICRO DEVICES, Data General Corporation, Electronic Memories & Magnetics Corporation, Hewlett-Packard Co., Intel Corporation, Mostek Corporation, National Semiconductor Corporation, RCA Corporation, Rockwell International and Signetics Corporation, Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Flying Tiger Line, Inc., Intervenor.

Nos. 83–1265, 83–1939.

United States Court of Appeals, District of Columbia Circuit.

Argued April 13, 1984.

Decided Sept. 7, 1984.

John W. Simpson, Washington, D.C., for petitioners in Nos. 83–1265 and 83–1939.

Mark W. Frisbie, Atty., C.A.B., Washington, D.C., with whom Ivars V. Mellups, Acting Gen. Counsel, C.A.B., Robert B. Nicholson and Marion L. Jetton, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondent in Nos. 83–1265 and 83–1939. David Schaffer, Atty., C.A.B., Washington, D.C., also entered an appearance for respondent.

David R. Murchison, Washington, D.C., was on the brief for amicus curiae, Air Transport Association of America in No. 83–1265, urging affirmance.

Joel Stephen Burton, Washington, D.C., entered an appearance for intervenor, Flying Tiger Line, Inc. in No. 83–1265.

Alfred J. Eichenlaub, Washington, D.C., with whom Joel Stephen, Burton and Robert L. Deitz, Washington, D.C., were on the brief for intervenor, Flying Tiger Line, Inc. in No. 83–1939.

Before WILKEY and WALD, Circuit Judges, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

A group of manufacturers who regularly ship electronics products via air cargo ("Electronics Shippers") petition for review of two proceedings before the Civil Aeronautics Board ("CAB" or "Board"). Because the two proceedings are related, we have consolidated them for purposes of decision. In one, the Board issued policy regulations regarding the circumstances under which it would not suspend an international cargo rate. In the other, the Board approved and gave antitrust immunity to an international cargo rate agreement of the International Air Transport Association ("IATA"). We do not disturb the Board's no-suspension policy, but we vacate and remand its approval of the IATA agreement.

## I

Comprehensive federal regulation of aviation began in 1926 with the Air Commerce Act, which was superseded by the Civil Aeronautics Act of 1938. Present regulation takes place under the Federal Aviation Act of 1958, Pub.L. No. 85–726, 72 Stat. 731 (codified in scattered sections of U.S.C.), as amended, which is a revision and recodification of the 1938 act. *See generally* G. DOUGLAS & J. MILLER, ECONOMIC REGULATION OF DOMESTIC AIR TRANSPORT 187–92 (1974).

Commercial air transportation encompasses at least four distinct businesses: domestic passenger, domestic cargo, international passenger, and international cargo. The Federal Aviation Act, as had its predecessors, originally granted the CAB vast powers over all four of these businesses. The Board could limit entry to the industry, allocate routes and impose conditions on the uses of the routes assigned, prevent carriers from abandoning routes previously assigned to them, regulate

mergers and methods of competition, and police intercarrier agreements. *See generally id.* at 197–202. Most important for purposes of these cases, the Act charged the Board with the prevention of unjust, unreasonable, unjustly discriminatory, or unduly preferential or prejudicial rates, fares, or charges. The Board was empowered to suspend the operation of any rate it suspected of violating one of those standards; and following investigation and upon a determination that a rate was unlawful, the Board could set the rate aside and mandate a change.[1] *See* 49 U.S.C. § 1482(d), (g), (j) (1976) (current version at 49 U.S.C. § 1482(d), (g), (j) (Supp. V 1981)).

In the late 1970's Congress quite clearly reduced CAB control over domestic and international passenger service and over domestic cargo service. Its actions with respect to the fourth category, international cargo carriage, were more ambiguous, and that ambiguity underlies both of these lawsuits.

## A. *Airline Deregulation in Congress*

Airline deregulation began essentially with the domestic cargo industry in 1977, when Congress, seeking to rely more heavily on competitive market forces, virtually eliminated CAB control over entry to the industry, over rates, and over places served. *See National Small Shipments Traffic Conference, Inc. v. CAB,* 618 F.2d 819, 823 (D.C.Cir.1980). Next came the Airline Deregulation Act of 1978, Pub.L. No. 95–504, 92 Stat. 1705, which provided for gradual CAB withdrawal from controlling domestic passenger service, culminating with the elimination of the CAB as of January 1, 1985. Finally, the International Air Transportation Competition Act of 1979 ("IATCA"), Pub.L. No. 96–192, 94 Stat. 35 (1980), introduced greater rate flexibility

for international passenger business, and it directed the Board, while exercising its international duties under the Federal Aviation Act, to seek, inter alia, to place "maximum reliance on competitive market forces and on actual and potential competition." *Id.* § 2, 49 U.S.C. § 1302(a)(4) (Supp. V 1981).

Each of these enactments affected the way in which the CAB could regulate rates. The Federal Aviation Act previously had empowered the Board to set aside rates it found to be unlawful and allowed the Board to suspend the implementation of rates likely to be unlawful. The 1977 amendments to the Act terminated immediately the Board's authority to set aside domestic cargo rates as unjust or unreasonable. *See Small Shipments,* 618 F.2d at 823. The Deregulation Act of 1978 set a January 1, 1983, termination date for the Board's control over the economic reasonableness of domestic passenger fares; in the interim, the Board was foreclosed from finding any such fare unjust or unreasonable, provided the fare was neither more than five percent higher nor less than fifty percent lower than a standard industry fare level. Finally, IATCA introduced a similar "zone of reasonableness" for international passenger fares, precluding finding any fare unjust or unreasonable if the fare is not more than five percent higher or less than fifty percent lower than a standard foreign fare level.

None of the deregulating statutes purported to set such precise limits on the Board's ratemaking functions regarding international cargo. While IATCA was pending in House-Senate Conference, however, legislation was introduced to do so, either by amending IATCA or independently. The bill, H.R. 5882, 96th Cong., 1st Sess. (1979), *reprinted in Competition in Inter-*

---

**1.** In the case of domestic transportation, the Board could actually set the lawful rate; in the case of overseas transportation—i.e., transportation involving U.S. territories or possessions, *see* 49 U.S.C. § 1301(24) (Sup. V 1981)—the Board could prescribe only a maximum and a minimum within which the just and reasonable rate could fall. 49 U.S.C. § 1482(d) (1976) (current version at 49 U.S.C. § 1482(d)(1), (2) (Supp. V 1981)). The Board can only reject rates for foreign transportation. There is no provision for the Board to set down maximum and minimum rates. *See id.* § 1482(j) (Supp. V 1981); Brief for Respondent in No. 83–1265, at 5 n. 3; Brief for Respondent in No. 83–1939, at 3–5.

national Air Cargo Transportation: Hearing Before the Subcomm. on Aviation of the House Comm. on Public Works and Transportation, 96th Cong., 1st Sess. 2 (1980) [hereinafter cited as Hearing], would have created a zone of reasonableness for international cargo rates similar to that provided for domestic and international passenger rates.

The CAB opposed the House bill, principally because of problems it foresaw in administering the proposed new rate structure. The problems derived from the fact that unlike passenger service, for which each carrier has only a few fares for each destination, cargo service involves a multitude of rates for each route, because carriers have developed different rates for different types of commodities. See Hearing, supra, at 5–6 (prepared statement of CAB Member Bailey). Also, in the past the Board generally considered rate increases as they affected the overall return to the carrier; that is, the Board did not generally look to see whether each individual rate provided a reasonable return on investment to the carrier, but, rather, it considered the return generated by the entire package of rates. Thus it was conceivable, though unlikely, that some individual rate was unreasonable and therefore would be an improper referent for a zone of reasonableness. See id. at 9–10 (Bailey testimony). The Board was somewhat more concerned that, even if every individual rate were reasonable, the same rate increase would not be reasonable for each rate. The House bill, however, provided for a uniform permissible rate increase, and the Board felt that it would be too difficult to undertake the economic analyses necessary for the obvious alternative, which is to calculate an appropriate upward zone of flexibility for each rate separately. See id. at 15–17 (Bailey testimony). The Board suggested that it might be more practical to allow it to develop its own system of rate flexibility, because the Board could experiment with different systems more easily through regulations than Congress

could through statutes. Id. at 18 (letter from CAB Chairman Marvin S. Cohen).

Whether due to CAB opposition or for other reasons, H.R. 5882 never made it out of committee, and IATCA was enacted without introducing a zone of reasonableness for international cargo rates. As it had suggested it would, however, the CAB set out to develop such a zone administratively.

### B. CAB's Proposed Deregulation of International Cargo Rates

In January of 1980, just two months after the hearings on H.R. 5882 at which the CAB opposed the bill, the Board proposed to allow carriers to increase international cargo rates up to five percent above a standard foreign rate level and to decrease them without limit. The Board not only would not suspend any rate in the zone, but would, without further investigation, conclusively presume the rate to be economically justified. The proposed rule, however, did not disavow the Board's right to disapprove or to suspend a rate for being unfairly discriminatory, prejudicial, or preferential, and the Board reserved the right in extraordinary circumstances to suspend a rate within the zone as unreasonable. See Statements of General Policy, 45 Fed. Reg. 3595, 3595, 3598 (1980) (proposed rule PSDR–65).

The Board asserted that "[t]he proposed represents no fundamental change ... in Board attitudes toward international cargo ratemaking," noting that the Board almost always had approved rate increases in recent years. Id. at 3595. See also Hearing, supra p. 1523, at 20 (Board reporting only five rate disapprovals between November 1978 and December 1979). The Board surmised that it had rarely found rates to be unreasonable because competition in the international cargo market kept rates in check. See 45 Fed.Reg. at 3595. Although recognizing that Congress had considered legislation to be necessary to create a zone of reasonableness similar to that embodied

in the proposed rule, the Board tried to minimize the novelty and significance of its proposal: since the Board already approved most rate increases, "[t]he principal effect of the proposed rule would be to reduce the regulatory lag inherent in any system of government review, to relieve carriers of the burden of submitting economic justification for rate changes within the specified zone, and to provide a regular procedure for taking account of operating cost changes." *Id.* at 3595–96.

The method of determining the standard rate level as proposed by the CAB was simpler than that in H.R. 5882, and to understand why, it is necessary to explain briefly the cargo rate structure. There are roughly four categories of cargo rates. The basic rate in each market is the general commodity rate ("GCR"); this is the rate a shipper pays if its commodity is not eligible for a special rate. The rate varies according to whether the commodity is shipped in bulk or in a container. Bulk GCR's are further broken down by weight-breaks—weight units within which the same rate applies—such that lighter shipments are charged more per weight unit than are heavier ones. 45 Fed.Reg. at 3596. Container GCR's are generally lower than bulk GCR's, because the carrier's cost in handling a single container holding many shipments is less than its cost in handling each of the shipments separately. *See* 48 Fed.Reg. at 4276. "Container GCR's are based on a fixed minimum chargeable weight per container, often with a uniform additional [sic] charge per weight unit above the minimum." 45 Fed. Reg. at 3596.

According to the CAB, less than half the volume of international cargo is charged under either of the GCR's. The majority is shipped under a second rubric, special commodity rates ("SCR's"). There are a multitude of SCR's, and in virtually all cases these rates are lower than GCR's. Like the GCR's, each SCR is market specific. *Id.* The carriers voluntarily offered the lower SCR's for a variety of reasons, including lower shipping costs, traffic-generating discounts, and a desire to develop steady customers. 48 Fed.Reg. at 4275.

A third category is the exception rate. Exception rates are charged for commodities requiring special handling; they are stated as a fixed—typically higher—percentage of the applicable GCR, and they apply uniformly in all markets. 45 Fed. Reg. at 3596. The fourth category is the priority rate, applicable to shipments requiring expedited handling, and charged as a fixed, higher percentage of the GCR. *Id.*

As the Board noted in its testimony on H.R. 5882, *see supra* p. 1524, establishing a distinct rate ceiling for each of this proliferation of rates "would be unwieldy and confusing," 45 Fed.Reg. at 3596. The solution the CAB settled upon in the proposed rule was to fix the ceilings for the zone of reasonableness by reference to bulk and container GCR's. The plan was to use the October 1, 1979, rate for each general commodity weight-break and container type in each market, and then to allow GCR's and SCR's, as well as other rates below the GCR level, to rise by up to five percent of that level without risk of being set aside. *Id.* The zone's upper boundary would be adjusted at least semiannually to account for changes in operating costs. *Id.* at 3597. Finally, exception and priority rates that were higher than the GCR could, without independent justification, change proportionately to any such adjustments in the standard rate, but any increase not justified by a standard rate increase would be subject to traditional reasonableness review by the Board. *Id.* at 3596.

### C. *The Final Zone-of-Flexibility Rule: PS–109*

The Board intended to proceed with rulemaking on an expedited schedule, *see id.* at 3597, but instead it engaged in lengthier proceedings, including oral argument and a postargument comment period, and the fi-

nal rule did not issue until January 1983, see *Statements of General Policy; International Cargo Rate Flexibility Policy,* 48 Fed.Reg. 4271 (1983) (final rule). The final rule, known as PS–109, differed from the proposed rule in two substantial respects.[2]

First, apparently due to comments challenging the Board's statutory authority to declare a rate just and reasonable without performing an economic analysis of the rate, *see id.* at 4272 ("Several comments challenged the Board's legal authority to declare all rates within a specific zone reasonable without investigating . . . ."), the Board limited the use of the zone to suspension decisions, *id.* ("Thus, this policy will not finally determine whether any rate within the zone is reasonable, as some of the commenters were concerned that it might."). Thus, except in extraordinary circumstances the Board would not suspend a rate that falls within the zone, *id.* at 4279 (to be codified at 14 C.F.R. § 399.-41(c), (d)), but the Board might nevertheless investigate, and perhaps set aside, a rate as economically unreasonable, even though falling within the zone, *id.* at 4272. At the same time, however, the Board placed on opponents of rate changes "the burden of showing reasonable grounds for investigating, or extraordinary circumstances for suspending, a new rate within the zone." *Id.* at 4273.

The second change involved the range of the zone. First, only bulk, and not container, GCR's would be used in determining the standard foreign rate level. No maximum increase for container GCR's was established. Second, the percentage increase above the standard rate would vary in different markets: in the Atlantic region rates could increase up to 20%; in the Pacific region a 15% ceiling was set; in the Western Hemisphere exclusive of Canada and Mexico the limit would be 5%; and in the Canadian and Mexican markets the

zone would allow a 10% rate increase. *See id.* at 4279 (to be codified at 14 C.F.R. § 399.41(c)).

The Board's actions were motivated by a desire to promote certainty and by its view that reducing the time needed to implement a new rate would be publicly beneficial, and it was guided by "the Board's central assumption that there is strong enough competition in international cargo markets to assure that rates will be set at reasonable levels within the flexibility zone without Board review." *Id.* at 4271–72. The range of upward flexibility from the GCR was thus limited by the Board's assessment of the strength of competition in each market, measured in terms of numbers of competing air carriers and availability of substitute transportation: where competition was deemed strongest, the greatest flexibility was allowed, and vice versa. *Id.* at 4274–75.

Similarly, competition—here the bargaining strength of various shippers—and not simply convenience was the reason for basing the standard rate on GCR's. The Board concluded that shippers who paid GCR's were generally small entities or infrequent shippers, both of which tend to diminish bargaining strength. Hence "[s]ince GCR shippers appear to have the greatest need for regulatory protection, [the CAB decided to] limit[ ] upward flexibility for those rates." *Id.* at 4275. And because competitive forces and shipper strength were deemed to have generated lower-priced SCR's, container GCR's, and highweightbreak GCR's, the Board felt less protection and more rate flexibility was warranted for those rates. On the one hand, the CAB predicted that the same competitive forces would keep the rates low. On the other hand, since the lower rates are essentially discount rates, it is more likely that any rate increase, up to the GCR limit, would be economically reasonable. *See id.* at 4275–76.

---

**2.** Concurrently with PS–109 the Board issued another rule, ER–1322, which exempts carriers from having to file economic justifications for rates that fall within the zone of flexibility. 48 Fed.Reg. at 4270 (to be codified at 14 C.F.R. § 221.165(d)(4)(ii)).

A final aspect of PS–109 important to this case and decided by reference to competitive forces is the rule's applicability to multicarrier rate agreements. The Federal Aviation Act allows the Board to approve and to grant antitrust immunity to such agreements. 49 U.S.C. §§ 1382, 1384 (Supp. V 1981). IATA and one carrier urged the Board to approve automatically any IATA rate increase that falls within the zone of flexibility. The Board rejected this position. Inasmuch as the concept of the zone of flexibility is grounded on perceptions of reasonably vital competition, "the rationale for automatic nonsuspension may be invalid or seriously undercut when the carriers are able to set prices in concert." 48 Fed.Reg. at 4278. The Board made it clear that it will "continue to expect all multicarrier agreements to be economically justified." *Id.* The Board also specified certain "minimum explanatory documentation" it expected to be filed along with any IATA rate agreement. *Id.*

### D. *The IATA Rate Agreement*

In May of 1983 various IATA carriers agreed to change their rates for carriage of cargo across the Pacific, and this agreement was submitted for CAB approval on July 18, 1983. The CAB gave public notice of the agreement, and when no objections were lodged the Board in a brief order approved the agreement and conferred antitrust immunity to the extent that any tariffs filed under the agreement would fall within the zone of flexibility created by PS–109. CAB Order 83–3–49 (Aug. 10, 1983), *reprinted in* Joint Appendix ("JA")[3] at 28. The Electronics Shippers petitioned for reconsideration, alleging that the agreement was illegal because not economically justified, and a carrier and intervenor herein, The Flying Tiger Line, Inc. ("Flying Tigers"), sought reconsideration to get approval of rates that exceeded the ceiling of the zone.

On reconsideration the Board affirmed its earlier order, though at somewhat greater length. First, the Board defended its reliance on the zones of flexibility, for although the Board had said it would not automatically approve IATA rates in the zone, *see supra* p. 1527, "the ceiling defines a zone of presumptive reasonableness where there is competition in the market." CAB Order 83–10–32, at 9 (October 6, 1983), JA at 43. Second, the Board denied that the absence of economic data from the carriers precluded approval of the agreement. Publicly available data, "the continued vitality of the competitive factors noted in" PS–109, and the Board's "own analysis and knowledge of the carriers' economic conditions" demonstrated to the Board's satisfaction that the rate increase was due to a legitimate need for revenue and was "disciplined" by competitive forces. *Id.* at 10, JA at 44. Finally, the Board refused to use a particular form of economic analysis requested by the Electronics Shippers, *id.* at 11, JA at 45, and it rejected Flying Tigers's request for rate increases above the zone ceiling, because the requested rates were not shown to be reasonable, *id.* at 11–13, JA at 45–47.

### E. *Review*

The Electronics Shippers have petitioned for review of the new rules regarding rate suspensions and the order approving the IATA rate agreement. Review in this court is available under 49 U.S.C. § 1486 (Supp. V 1981), which permits the court upon timely petition to "affirm, modify, or set aside the order complained of, in whole or in part, and if need be, to order further [administrative] proceedings," *id.* § 1486(d). Findings of fact are subject to substantial evidence review. *Id.* § 1486(e). The standard of review otherwise is provided by section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706(2) (1982).

Petitioners contend that through the zone of flexibility the Board in effect has deregulated ratemaking in the international cargo industry, thereby abdicating its stat-

---

**3.** Unless stated otherwise, references to JA are to the Joint Appendix submitted in No. 83–1939.

utory obligations to ensure the reasonableness of international cargo rates. The abdication is borne out, according to the Shippers, by the Board's action on the IATA agreement, which they challenge for having failed to follow the Board's own procedures as well as for having failed to satisfy the substantive statutory prerequisites for approval of the agreement. The petitions were argued before the same panel on the same day. For convenience, we decide them in the same opinion, and we will now consider the two petitions in sequence.

## II

A carrier introduces a new rate by filing a tariff with the Board. *See* 49 U.S.C. § 1373 (1976 & Supp. V 1981); *id.* § 1482(j)(1) (Supp. V 1981). The CAB requires international cargo tariffs to be filed at least 60 days before they are to become effective. 14 C.F.R. § 221.160(a)(3) (1981). The Board also requires that carriers supply certain economic data, including estimates of the carrier's expected costs and revenues under the new rates, to support the new tariff. *Id.* § 221.165(b). During the pendency of the tariff, the Board decides whether to take any action adverse to its implementation, including suspension of the tariff and/or investigation into the lawfulness of the rates contained therein. *See* 49 U.S.C. § 1482(j)(1) (Supp. V 1981); 48 Fed.Reg. at 4272; Brief for Respondent in No. 83–1265, at 5–6.

The statute does not mandate rate suspension under any particular circumstances, but says only that pending a hearing and decision on the lawfulness of the rates the Board "may suspend the operation of such tariff." *See* 49 U.S.C. § 1482(j)(1), (2) (Supp. V 1981). Thus the decision to suspend *vel non* is highly discretionary[4] and, as a result, has generally been thought to

be unreviewable by the courts. *See Nader v. CAB*, 657 F.2d 453, 455–56 (D.C.Cir. 1981). As Judge Wright suggested in *Nader*, however, the nonreviewability doctrine probably is a variant of the final order doctrine, resting on the fact that a suspension decision arguably is "interlocutory in nature," inasmuch as an inquiry will follow to determine the lawfulness of the rates in question. *Id.* at 456 n. 10; *see also Exxon Pipeline Co. v. United States*, 725 F.2d 1467, 1475 (D.C.Cir.1984) (Wright, J., concurring) (a suspension decision "that disposes of substantial private rights" should be reviewable).

■ This is not a typical suspension case, however, for the Board's present orders (we refer here to both PS–109 and ER–1322, *see supra* pp. 1525–1526 & n. 2) do not decide whether to suspend any particular rate but rather purport to govern all future CAB decisions regarding the suspension of international cargo rates. The Board's decision is final and is effectively an act of legislative rulemaking, limiting the discretion otherwise available to the agency. *See Levesque v. Block*, 723 F.2d 175, 181–82 (1st Cir.1983) (rule creating new law pursuant to grant of legislative rulemaking power is substantive rule, not interpretative). Because these orders are neither interlocutory nor entirely discretionary, we find them reviewable, as did the *Nader* court in similar circumstances. *See Nader*, 657 F.2d at 456.

■ The subject matter of the orders does affect the standard of review, however. The decision whether to suspend a rate is not a determination on the merits of the legality of that rate. In theory both the Board and the courts will have a further opportunity to evaluate whether a given rate is just and reasonable. Moreover,

4. The Board's discretion is not limitless. Whenever it suspends a rate, it must explain to the carrier the reasons for its actions. Moreover, before the Board can suspend a foreign air carrier's rate, it must find that suspension is in the public interest. 49 U.S.C. § 1482(j)(1), (2)

(Supp. V 1981). By requiring findings (some of which relate directly to the Board's rate-approval functions), both of these provisions in effect limit the Board's discretion, at least when exercised in favor of suspension.

if due to this policy a rate is not suspended but is later determined to be excessive, shippers can attempt to recover the overage through a suit in restitution. *See Moss v. CAB,* 521 F.2d 298, 307–08 (D.C.Cir. 1975), *cert. denied,* 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976). Because of these characteristics of individual rate-suspension decisions, in reviewing the Board's general decision not to suspend rates under certain circumstances, our focus should be on whether the Board has made a rational decision that is not likely to lead to arbitrary or capricious results, and on whether the Board has relied on statutorily relevant considerations. *See Exxon Pipeline,* 725 F.2d at 1473 (review must ensure that agency did not reach decision regarding length of suspension " 'for an impermissible reason or for no reason at all' " (quoting *Dunlop v. Bachowski,* 421 U.S. 560, 573, 95 S.Ct. 1851, 1861, 44 L.Ed.2d 377 (1975))); *id.* at 1484–86 (Wright, J., concurring); *cf. National Air Carrier Association v. CAB,* 436 F.2d 185, 194–95 (D.C.Cir. 1970) (judicial review of interim rate approval should be more limited than review of full approval after consideration of the entire record).

We note at the outset that *Nader* has treated similar issues. The Airline Deregulation Act of 1978 forbade the Board from finding a domestic passenger fare to be unjust and unreasonable if it fell within a particular range. The Board promulgated a rule stating that it would not ordinarily suspend rates that exceed by a certain percentage the upper end of the range or that fall below the bottom of the range. Petitioners in *Nader* alleged that the rule overstepped the Board's authority under the Deregulation Act. This court upheld the rule since "there is nothing in the [Deregulation Act] to suggest that the Board's discretion to suspend or not to suspend air fares outside this zone was in any way altered." 657 F.2d at 458 (footnotes omitted). It was thus clear to the court that under the Federal Aviation Act the Board was free to establish a suspension policy;

the Deregulation Act altered this authority only to the extent that it deprived the CAB of the ability to suspend or to cancel rates within the range specified therein. *Id.*

■ Petitioners here attempt to distinguish the case, arguing first that the Board's action in *Nader* was in a period of transition to total statutory deregulation, and second that the challenge there was premised on the Deregulation Act. Reply Brief of Petitioners in No. 83–1265, at 9–10. These differences in no way detract from *Nader*'s fundamental point, which is that under the Federal Aviation Act and without regard to the Deregulation Act the Board can establish a policy of limited suspension. Although the Board's suspension powers with respect to international cargo derive from a different subsection, *see* 49 U.S.C. § 1482(g) (Supp. V 1981) (passenger fares); *id.* § 1482(j) (1976 & Sup. V) (international cargo), Congress intended the powers to be virtually equivalent, *see generally* H.R. REP. No. 854, 92d Cong., 2d Sess. 1–2 (1972) (principal differences are that Board can suspend foreign rates but cannot prescribe them, and decision to suspend foreign rate is subject to disapproval by President), *reprinted in* 1972 U.S.CODE CONG. & AD.NEWS 2100, 2100–01. We conclude, therefore, that *Nader* affirms the Board's statutory authority to develop a suspension policy. We turn now to evaluate the Board's development of this particular policy.

Although the Board did not put it this way, one can think of a rate suspension decision as a risk-shifting device: Should the carrier or the shipper bear the risk that a new rate might not be lawful? If the Board suspends a rate increase, and this rate is later determined to be just and reasonable, the carrier in the interim must forego revenue to which it otherwise is entitled, and there is no way to recoup that loss. If the Board does not suspend a rate that turns out to be unjust and unreasonable, the consumer (shipper) has been forced to pay unlawful rates, but, unlike carriers, consumers at least in theory

might be able to prove entitlement to restitution, *see Moss v. CAB*, 521 F.2d at 307–08.

A variety of factors might influence the allocation of the burden. One, of course, is the differing abilities of the parties to recoup losses. Another is the ability of competitive forces to prevent unreasonable rate increases. *See, e.g., Exxon Pipeline Co.,* 725 F.2d at 1471–72 (comparing consumers' abilities to withstand and to prevent rate increases in electric power, natural gas, and oil pipelines). Regardless of how the agency assesses the likelihood of unreasonable rates and the ability of the parties to withstand suspension decisions, it must also pay attention to Congress's concerns in granting the suspension power, for Congress might have expected that the risks of ratemaking ought ordinarily to fall to one party or the other. *Cf. FPC v. Texaco, Inc.,* 417 U.S. 380, 399, 94 S.Ct. 2315, 2327, 41 L.Ed.2d 141 (1974) (even if FPC found that market constraints force small producers' gas prices to be reasonable, it cannot rely on marketplace because "Congress could not have assumed that 'just and reasonable' rates could conclusively be determined by reference to market price"); *Farmers Union Central Exchange, Inc. v. FERC,* 734 F.2d 1486 (D.C.Cir.1984) (despite FERC's assertion that market conditions have changed since statute's enactment, FERC could not rely exclusively on undocumented market forces to regulate oil pipeline prices because Congress imposed regulation due to its perception of market failures). One other consideration is expectancy—does the suspension decisionmaking process lead to reasonably consistent results, such that a carrier can reasonably assess the likelihood (and likely length) of a suspension, and plan accordingly. *See Exxon Pipeline Co.,* 725 F.2d at 1470–72 (citing cases discussing need for coherent suspension policy); *id.* at 1485 (Wright, J., concurring) ("our task is to see to it that [FERC] adopts *some* policy and

applies it with reasonable consistency" (emphasis in original)). This list is meant to be suggestive, not exhaustive.

■ The CAB made such evaluations in this case. There can be no doubt that the Board's initiation of the zone of flexibility was in response to the suggestion of at least some members of Congress that international cargo-rate flexibility was desirable. The Board, while sympathetic to the concept, initially resisted congressional action because it felt that its policies already provided carriers considerable latitude to change rates, as witnessed by the Board's nearly unfailing approval record in the years just preceding the proposed rule. *See* 45 Fed.Reg. at 3595 ("carriers seldom have had difficulty obtaining Board approval for ... rate increases"); *supra* pp. 1524–1525. After congressional prompting, however, and perhaps in response to Flying Tigers's testimony that delay preceding Board approval was its principal problem, the Board sought a means to institutionalize the rate flexibility it already allowed while reducing the time needed to put new rates into effect. *Cf.* 45 Fed.Reg. at 3595 ("The principal effect of the proposed rule would be to reduce the regulatory lag ...."). *But cf. Hearing, supra* p. 1524, at 21 (letter from CAB Chairman Marvin S. Cohen) ("We do not believe that the Board's procedures for reviewing tariff filings have resulted in any undue delay in the implementation of cargo rate increases for Flying Tiger or other carriers.... Typically, any 'regulatory lag' in implementing proposed rate increases has resulted from difficulties in obtaining foreign government approvals ...."). Since past practice suggested that most rates would be approved with or without prior suspension, the Board in effect concluded that it could safely shift the interim risk of disapproval away from the carriers with little possibility of harm to shippers. *See* 48 Fed.Reg. at 4273 (flexibility needed "because the harm caused by maintaining the

*status quo* pending possible investigation often outweighs the benefits").[5]

Other factors influenced the decision. The Board was convinced that the past reasonableness of rates was not due to regulation (or altruism) alone. Rather, cargo rates in most markets had been constrained by competitive forces, including the relatively low-cost and abundant cargo capacities of passenger craft, charter flights arranged by freight forwarders, and the bargaining strength of large shipping interests. According to the Board, these competitive forces could be expected to continue to keep rates reasonable. *See id.* at 4273–75; 45 Fed.Reg. at 3595.

Another concern that seemed to animate congressional and agency interest in some form of rate flexibility was the carriers' perceived need to pass on rapidly escalating fuel costs. *See, e.g., Hearing, supra* p. 1523, at 16 (Rep. Mineta) ("[A]nd recognizing what is happening in fuel costs alone, shouldn't there be some degree of allowance for that zone of reasonableness to exist?"); 48 Fed.Reg. at 4273. The new policy would facilitate that goal, both by allowing fuel-prompted rate increases in the zone to go into effect without suspension and by establishing a regular procedure by which carrier cost increases would be incorporated into the standard rate level.

Final considerations entering into the Board's policy were administrative convenience and policy consistency. The Board felt the plan it chose was more manageable

than that proposed in H.R. 5882. Also, according to the CAB, its ad hoc suspension in the past had caused uncertainty that damaged air cargo service. A reliable suspension policy would help the industry and encourage more innovative pricing. 48 Fed.Reg. at 4273.

■ The preceding is a rational justification for establishing a zone of rates that will not be subject, in ordinary circumstances, to suspension. As a growing number of cases have noted, there is value in an agency articulating some suspension policy upon which the regulated industry can rely. *See, e.g., Exxon Pipeline Co.,* 725 F.2d at 1484–85 (Wright, J., concurring); *Connecticut Light & Power Co. v. FERC,* 627 F.2d 467, 473 (D.C.Cir.1980). The CAB's discussion of this particular policy evidences a reasonable consideration of carrier and shipper interests and their respective abilities to protect those interests. Past experience and market forces provide an adequate basis for determining that modest rate increases can safely be allowed to be implemented without suspension, and the Board retained full power to suspend immodest rate changes. Finally, the CAB's reasons bear a reasonable relationship to, and are not in conflict with, its statutory responsibilities; although the policy was not developed by systematic reference to the criteria for rate cancellations set out in 49 U.S.C. § 1482(j)(5) (1976 & Supp. V 1981), those criteria do not govern rate suspensions directly, and the Board's rea-

**5.** In their comments to the Board, petitioners alleged that the Board had made a change of policy, going from the position presented to the House subcommittee (that there is no regulatory lag) to the one adopted in the rulemaking (asserting a need to eliminate regulatory lag). Because the Board did not specifically address this comment, petitioners argue the rule should be vacated. We reject this argument for three reasons.

First, although agencies should be candid in their presentations to Congress, a statement made in congressional testimony is not the sort of agency rule or policy statement from which the agency may deviate only after extensive explanation. Second, although Member Bailey and Chairman Cohen disputed the existence of regulatory lag, they did not argue that rate flexibility was unnecessary. Their basic disagreement with the subcommittee concerned how to accomplish that goal. The subcommittee suggested implementing a legislative regime of flexibility. Bailey and Cohen preferred an administrative regime. The question for the CAB then became whether to leave their flexibility policy de facto, and eventually the Board decided that it was better for them to assure the carriers, through PS–109, that flexibility was indeed its policy. Third, even assuming that the Board did change its policy after the subcommittee testimony, it justified the shift adequately, as explained in the text preceding this note.

soning and conclusions do not necessarily undercut its ability to consider them at the appropriate time.

The Electronics Shippers challenge the policy for a variety of reasons, many of which rest on the conclusion that the Board has done more than just create a suspension-free zone. They have calculated that because the SCR's are lower than the ceiling GCR's, the zone of flexibility contemplates transpacific electronics SCR increases of up to 63%, on average. They then complain that the Board has permitted these increases without making a determination of the reasonableness of the rates, without referring to other statutory ratemaking criteria, without adequately responding to comments in the rulemaking, by relying impermissibly on competition, and by improperly resting the standard rate on GCR levels. *See* Brief for Petitioners in No. 83–1265, at 6–27. They summarize all these arguments by stating that "[t]he Board has authorized a 63% increase in specific commodity rates without complying with" statutory ratemaking or rulemaking requirements. *Id.* at 6 (emphasis omitted).

Whatever merit these arguments might have if the Board actually had approved a 63% rate increase, they are largely irrelevant to discussion of a nonsuspension policy, because the Board has not authorized, approved, or found just and reasonable any rate whatsoever. Unlike the rule proposed in 1980, which would have created a near-conclusive presumption that rates within the zone were just and reasonable, the final rule simply allows rates in the zone to go into effect without suspension in most circumstances. The Board still may investigate the new rates and can set them aside if found to be unjust, unreasonable, or otherwise infirm. *See supra* p. 1526. To the extent that the Electronics Shippers' arguments rest on their bare and unsubstantiated conclusion that the Board has approved rate increases, they merit no further discussion.[6]

The Electronics Shippers allege, however, that aspects of the Board's orders effectively foreclose the possibility of any meaningful inquiry into rate reasonableness. They cite the Board's decision that opponents of rate changes within the zone should have the burden of "showing reasonable grounds for investigating, or extraordinary circumstances for suspending," the new rate. 48 Fed.Reg. at 4273. At the same time, the Board exempted carriers from having to submit economic data to justify rate increases within the zone, *see supra* n. 2, although the Board retained "the power to require carriers to submit economic justifications on an *ad hoc* basis where opponents show substantial likelihood of harm to their interests or other evidence that a new rate may be unreasonable," 48 Fed.Reg. at 4273.

But the Shippers contend that the carriers are the only source of pertinent information that might demonstrate "reasonable grounds" for believing that a rate is unreasonable. By placing on the opponents the burden of bringing forward such evidence, while simultaneously eliminating the carriers as an information source, the Board has both shifted the normal burdens of proof

---

6. Arguably even the no-suspension rule is invalid because it leads to arbitrary results. *See supra* pp. 1528–1529. It may allow electronics SCR's to increase by 63% without suspension while contemplating suspension of certain GCR's after increasing only 15%. Although this disparity may be justified by different costs of carrying the commodities involved, the Board did not rely on this reason in reaching its decision. In fact, the Board has not expressed any view on the point, but neither have the Electronics Shippers made this particular objection.

We need not reach the question whether a no-suspension policy that could lead to such disparate results is arbitrary or capricious, however, given our view that a 63% rate increase probably is itself at least reasonable grounds to investigate, *see infra* pp. 1534–1535; perhaps, too, such an increase could be shown to constitute "extraordinary circumstances" for suspension, within the meaning of the rule.

and made the burden impossible for opponents, like the Electronics Shippers, to bear. Brief for Petitioners in No. 83–1265, at 39–40. The Shippers are also concerned that they will never be able to demonstrate extraordinary circumstances to justify a rate suspension. Their biggest fear seems to be that the carriers will increase electronics SCR's up to the ceiling of the zone—by perhaps as much as 63% or more—while the Shippers will be unable to meet their burden of showing reasonable grounds to believe the new rates are unreasonable.

This argument has several parts, each of which should be analyzed separately. At the simplest level the Electronics Shippers are complaining that the Board has made it less likely that rates will be suspended pending investigation, because it is very difficult for shippers to prove that "extraordinary circumstances" exist. As we have already discussed, however, the Federal Aviation Act does not mandate suspension under any particular circumstances, and the Board's decision not to suspend rates in the flexibility zone is reasonably supported. *See supra* pp. 1528–1532. The "extraordinary circumstances" condition for suspension provided by the rule is also reasonable. In large measure this standard parallels the one courts use in determining whether to issue stays or preliminary injunctions.[7] Although the Board certainly could allow

suspensions in circumstances less "extraordinary," the injunction standard is an appropriate one to follow, inasmuch as a suspension in effect enjoins the carrier from implementing a rate for up to one year prior to any determination that the rate is not lawful.

The second component of the argument is that, according to the Electronics Shippers, no information accessible to the shippers could suffice to demonstrate "reasonable grounds" for investigating a rate change. The Shippers contend that the only relevant data are those which relate revenues from a rate increase to the costs of providing the service. But shippers

> have no cost information and no revenue information. We do not know the volume of traffic which moves under a particular commodity rate and therefore we could not estimate how much additional revenues the rate increase would produce. We do not know the carriers' investment and could not even guess whether a proposed rate would produce an unreasonably high return on investment. Only the carriers have that information and the Board does not require them to produce it.

Brief for Petitioners in No. 83–1265, at 31–32. The Electronics Shippers also are not reassured by the Board's statement that economic justifications "may be required where crucial information can only

---

7. The final rule contemplates two types of extraordinary circumstances. The one considered in text is when it is "highly probable" that an investigation will prove the rate to be unreasonable, the public will likely suffer "immediate and irreparable harm," and the public interest supports suspension. 48 Fed.Reg. at 4279 (to be codified at 14 C.F.R. § 399.41(d)(2)). This is very similar to the standard for preliminary relief in this circuit. *See Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir. 1958) (likelihood of success on the merits, irreparable harm to petitioner, minimal harm to other parties, public interest).

The other extraordinary ground for suspension is when it "is in the public interest because of unreasonable regulatory action by a foreign government with respect to rate proposals of an air carrier." 48 Fed.Reg. at 4279 (to be codified

at 14 C.F.R. § 399.41(d)(1)). Petitioners seem not to be concerned by this clause, though they condemn it along with the others by saying that these "standards appear to have no relationship to the ratemaking standards of the Act." Brief for Petitioners in No. 83–1265, at 32 n. 7. No statutory standards expressly govern the decision whether to suspend rates, however. Moreover, one of the reasons Congress conferred the suspension power on the CAB for foreign rates was to counter outrageous conduct by foreign governments, *see* H.R.Rep. No. 854, *supra* p. 1529, at 13–15 (letter from Transportation Secretary Volpe proposing that CAB have retaliatory powers), *reprinted in* 1972 U.S.Code Cong. & Ad. News at 2104–06, although admittedly a different subsection deals expressly with the problem of adverse actions by foreign governments, 49 U.S.C. § 1482(j)(3) (1976).

be provided by the carrier," 48 Fed.Reg. at 4273. Since crucial cost and revenue data in every case will be in the hands of the carriers, and since it seems unlikely that the Board meant this clause to be invoked in every case, the Shippers believe it further demonstrates that the Board has no intention of ever investigating rate changes seriously by requiring any form of economic justification from the carrier. *See* Brief for Petitioners in No. 83–1265, at 33–34.

The Electronics Shippers are fully justified in having focused on cost and revenue data. The Board has long determined the reasonableness of rates by reference to the carrier's return on investment. *See infra* pp. 1545–1546. If the Board had now structured its rate investigation so as to impose on the opponents the burden of showing an unreasonably high rate of return, while also foreclosing meaningful access by the opponents to relevant cost and revenue data, we would have serious doubts about the legality of its actions. The imposition of such sisyphean tasks by a regulatory agency is a prototypical arbitrary and capricious act. In this particular context, moreover, it would herald the virtual abandonment of cost justification and near complete reliance on competition for rate regulation by the CAB, a move not proven to be consistent with the Board's statutory mandate. *See infra* pp. 1539–1542.

We are not convinced, however, that the Board has taken such drastic steps. Rather than viewing the Board as having abandoned cost-based rate determinations, we consider it to have relaxed the elements of the opponent's prima facie case of unreasonableness, to accommodate the opponent's likely lack of access to cost data. We have little trouble reading the "reasonable grounds" requirement to call for a showing of a steep rate increase, several rate increases in rapid succession that are not related to any apparent changes in costs, discriminatorily high increases for particular commodities, a decline in competition, or any other factor that would either undercut the premises for the Board's hypothesis of reasonableness within the zone or indicate unreasonable rates of return.[8] Indeed, this is how the Board treats the requirement in its brief.[9] It would be very surprising if a 63% rate increase were not alone reasonable grounds to investigate further. We have no reason to believe that the CAB will not respond to such information by investigating appropriately, *see, e.g., Wold Communications, Inc. v. FCC,* 735 F.2d 1465, 1476 (D.C.Cir.1984), and a Board order approving a rate or denying a request for information would be reviewable in court, *see* 49 U.S.C. § 1486 (1976). *See generally Permian Basin Area Rate Cases,* 390 U.S. 747, 772, 88 S.Ct. 1344, 1362, 20 L.Ed.2d 312 (1968) (no reason to assume that FPC will not evaluate petitions expeditiously, but if FPC does not, issue can be reconsidered).

■ A third component of the Electronics Shippers' argument is that the Board's

---

8. This is not to say that such allegations must necessarily trigger a full-scale investigation by the Board, but they should at least suffice to move the Board to require rate justifications from the carrier.

We note at this juncture that the Electronics Shippers' concerns stem in part from the Board's rule that a party seeking to have the Board suspend a rate must either request a suspension within ten days of the tariff's issued date, 14 C.F.R. § 302.505(b) (1983), or show "compelling reasons" for failure to comply with the ten-day limit, *id.* § 302.505(c). If information contained in a carrier's economic justification, submitted as a result of shipper opposition, were to demonstrate "extraordinary circumstances" for suspension, and if the information

were not otherwise available, we would think it arbitrary and capricious not to consider prior lack of access to the information to be a "compelling reason."

9. It seems obvious to the Board that a complainant could show a variety of relevant factors, including an assessment of the effect of a rate increase on its business; a comparison of rate changes to such generally-available information as fuel cost changes, inflation, etc.; a comparison of the size of the rate increase to rate changes for other commodities; and an analysis of the extent of competition affecting the specific rates at issue.

Brief for Respondent in No. 83–1265, at 46–47.

new rules will prevent rates from being found discriminatory. This is a bit puzzling, because PS–109 does not purport to affect the standards for suspending rates on that ground, but the Shippers assume that the rule's allocation of the burden of proof to support suspensions and investigations applies to charges of discrimination as well as unreasonableness. Although we do not see that application anywhere in the Board's statement, we will assume it is true.[10]

Petitioners note that the Board defines discrimination "in economic terms, as the act of charging different customers prices that differ by varying proportions from the costs of serving them." CAB Regulation PS–93, at 1, 45 Fed.Reg. 36,058 (1980). Thus discrimination is a cost-based concept, yet with the carriers no longer required to produce data on costs, the Shippers argue they will not be able to amount an effective challenge to rates based on discrimination.

The answer here seems to be the same as that for the Shippers' concerns about challenges based on reasonableness. Apparently the Board will accept arguments based on factors other than cost to justify investigations of discrimination. As the Board notes in its brief, one does not need cost data to make out a prima facie case of discrimination, which is "widely disparate rate increases and decreases." Brief for Respondent in No. 83–1265, at 47. On its face, therefore, the Board's policy does not prevent discrimination challenges. *Cf. National Small Shipments Traffic Conference, Inc. v. CAB,* 618 F.2d 819, 831 (D.C. Cir.1980) (upholding exemption of domestic cargo carriers from having to file tariffs, over objection that it would hinder CAB prevention of discriminatory rates). And

once again, we note that the Shippers will always be able to seek judicial relief from arbitrary Board action with respect to particular rates in the future.

■ The fourth aspect of the Shippers' burden-of-proof argument is that it is arbitrary to place any burden on parties without access to important information. They cite several cases and the Board's own rules of practice that stand for the general proposition that a litigant with unique access to evidence establishing or negating a proposition should have the burden of going forward with that evidence. *See* Brief for Petitioners in No. 83–1265, at 27–30 (citing *United States v. New York, N.H. & H.R.R.,* 355 U.S. 253, 256 n. 5, 78 S.Ct. 212, 214 n. 5, 2 L.Ed.2d 247 (1957); *Environmental Defense Fund, Inc. v. EPA,* 548 F.2d 998, 1017–18 (D.C.Cir.1976), *cert. denied,* 431 U.S. 925, 97 S.Ct. 2199, 53 L.Ed.2d 239 (1977); *International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 643 (D.C.Cir.1973); *Puerto Rico v. Federal Maritime Commission,* 468 F.2d 872, 878 (D.C.Cir.1972); *Standard Foreign Fare Level,* CAB Order No. 80–8–66, at 13 (Aug. 12, 1980); *Increased Valuation and C.O.D. Charges Proposed by Railway Express Agency, Inc.,* 27 C.A.B. 542, 543–44 (1958); 14 C.F.R. § 221.165 (1983)). Thus the ordinary rule in ratemaking proceedings in particular is that the rate proponent has the burden of going forward with evidence to demonstrate the rate is reasonable. *See Puerto Rico,* 468 F.2d at 879–81.

Although the Board has placed an initial burden on the rate opponent, and thereby arguably has acted in conflict with the general rule the Shippers recite,[11] the Board has remained faithful to the underlying

---

**10.** The Shippers suggested that the Board require all rates to change uniformly in order to receive the benefit of the zone. They argue that the Board's failure to respond to their suggestion is a basis for vacating the rule. Since the rule did not purport to affect the standards regarding discriminatory-rate suspensions, the comments were of questionable relevance and

the Board's inattention was at worst harmless error. *See* 5 U.S.C. § 706 (1982).

**11.** The Electronics Shippers fail to recognize that the rate-making cases and rules deal with investigations, not suspension. The Board has not changed its rules in this regard; once it embarks on a formal investigation, the burden is on the carrier to make the initial case that its

principle that a party should not be expected to produce information to which it has no access. As we understand it, the Board has simply required rate opponents to bring forward information to which they do have access in order to justify a rate inquiry. The Board has reasonably explained its decision to place this new, modest burden on rate opponents to demonstrate, with information to which they do have access, some need for cost data and a rate investigation. *See supra* pp. 1534–1535 (discussing nature of burden). In many cases, if not most, rate changes go unopposed. In those cases, requiring cost data is an unnecessary and taxing imposition on the carriers, according to the Board. The Board determined that it could accomplish its regulatory duties more efficiently by requiring cost data only when rates are challenged, *see* 48 Fed.Reg. at 4273, and this sort of decision by an agency regarding its enforcement strategy is entitled to considerable judicial deference, *see Building & Construction Trades' Department, AFL–CIO v. Donovan*, 712 F.2d 611, 629 (D.C.Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 975, 79 L.Ed.2d 213 (1984). *Cf. Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 417–18 (D.C.Cir.1983) (approving simplified license-renewal practice that relies heavily on complaints to trigger investigations; FCC determined that new practice would achieve same level of compliance as previous one), *cert. denied,* — U.S. —, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984).

The last challenge to PS–109 of any substance is that the Board failed to address one request the Electronics Shippers made in their comments to the agency. *See Action on Smoking & Health v. CAB*, 699 F.2d 1209, 1216 (D.C.Cir.1983) (arbitrary for statement of basis and purpose not to respond to comments and to explain how agency resolved issues raised), *supplemented,* 713 F.2d 795 (D.C.Cir.1983). Until 1978 the Board required all carriers to submit separate data on their all-cargo operations, and the report was made on Form 242. The Electronics Shippers requested that the Board reinstitute the Form 242 requirement so that the all-cargo costs of all carriers could be used in the recomputation of the standard foreign rate level that will be done periodically in order to account for changes in the cost of service. (The Board's current policy is to rely on passenger cost data and on data from the one U.S. all-cargo carrier, Flying Tigers, to make the recomputation. *See* 48 Fed.Reg. at 4277.) The Board did not do so and did not respond directly to the request.

█ We find this to be harmless error for two reasons. *See* 5 U.S.C. § 706 (1982) (courts to give "due account [to] the rule of prejudicial error"). First, the Board did address the idea of adding reporting requirements and rejected it. 48 Fed.Reg. at 4277 (CAB believes available data adequate; if inadequate in practice, will impose appropriate new reporting requirements). The Board also explained why it felt that domestic passenger data are relevant and adequate. *Id.* The statement failed to mention specifically the Electronics Shippers or Form 242, but it is fairly clear that all the Board left out is those few words; the outline of its response on the merits is evident, and therefore, while we do not mean to trivialize the Board's failure to respond to the Shippers directly, the harm to the Shippers of this omission is negligible. In addition, if the Board were ever to investigate any rate increase, presumably it would require the carrier to submit actual cost data for all-cargo and combination craft. *See, e.g.,* JA at 99 (CAB sample format sheet for carrier submissions with separate entries for all-cargo and combination craft). That data could be used both to demonstrate that a particular rate is unreasonable and to demonstrate that the Board's cost-pass-through methodology is inadequate.

Because the Board did respond to the issue the Electronics Shippers raised, and

proposed rate is reasonable. *See* 14 C.F.R. § 302.506 (1983).

because the prejudice to the Shippers due to the Board's failure to act as requested (let alone due to its failure to mention the Shippers and Form 242 by name) is so slight, the error in not responding more directly does not warrant our vacating the rule. For this and all the foregoing reasons, we reject petitioners' challenge to the Board's limited-suspension policy.

### III

Shortly after the Board issued PS–109, it approved and gave antitrust immunity to an IATA cargo-rate agreement covering transpacific shipments. In doing so, the Board relied in part on PS–109. Upon motion for reconsideration, the Board reaffirmed its approval in a second order.. In this part we consider the Board's reasons in the two orders and find them wanting. We therefore vacate the orders approving the IATA rate agreement.

### A. *Multicarrier Agreements*

Generally speaking, before international cargo rates can be implemented, they must be approved by the governments of at least two countries, the United States and the country of origin or destination. Over the years, the process of governmental approval has been facilitated, ostensibly,[12] by international conferences of carriers under the auspices of IATA. After an IATA conference reaches agreement on rates that all member carriers will charge on routes among a number of nations, the agreement will be submitted to the respective nations' governments for approval.

The CAB is empowered to approve such multicarrier agreements. 49 U.S.C. § 1382 (Supp. V 1981). Once the CAB has approved an agreement, the carrier must still file a tariff encompassing the approved rates in order to implement them. Because

the process of Board approval, to be described shortly, is a complete substitute for the new-tariff investigation that the Board might undertake pursuant to *id.* § 1482 (1976 & Supp. V 1981), no further investigation is required or performed should the carrier file a tariff embodying the approved IATA rates. *See* 14 C.F.R. § 221.165(d) (1983) (exemption from requirement of submitting economic justifications in case of tariff filed pursuant to approved multicarrier agreement). Thus CAB investigation of an IATA agreement is the only occasion for a determination of the lawfulness of the rates that might be filed pursuant to the agreement, although, because carriers do not always file tariffs after the Board approves their agreements, Board approval does not automatically trigger any rate changes. *See generally National Air Carrier Association v. CAB*, 436 F.2d 185, 186 (D.C.Cir.1970) (discussing IATA and its relationship with CAB).

As intimated in part II, the Federal Aviation Act simply provides the Board with authority, upon its own initiative or upon complaint, to investigate filed tariffs and to suspend them. In contrast, the statute mandates expressly that when a multicarrier rate agreement is submitted to it, the Board must either approve or disapprove the agreement, and in order to do so it must make several determinations regarding competition, the public interest, statutory ratemaking criteria, and other public policy considerations.

The Board is enjoined to disapprove any agreement "that it finds to be adverse to the public interest or in violation of this chapter." 49 U.S.C. § 1382(a)(2)(A) (Supp. V 1981). In addition, the Board is forbidden to approve an agreement "which substantially reduces or eliminates competition, unless it finds that the … agreement … is necessary to meet a serious transpor-

---

**12.** The Board has made a factual determination in an earlier proceeding that IATA agreements serve important foreign policy goals and presumably help achieve international agreement and cooperation. *See* CAB Order 83–7–51, at 4

(July 14, 1983), JA at 66. As the Board noted in the orders under review, however, not all governments always approve IATA agreements. *See* CAB Order 83–10–32, at 6 n. 13, J.A. at 40 n. 13.

tation need or to secure important public benefits, including international comity or foreign policy considerations, and it does not find that" the need or benefit can be taken care of by "reasonably available alternative means having materially less anticompetitive effects." *Id.* § 1382(a)(2)(A)(i). Finally, the Board is directed to approve agreements, other than anticompetitive agreements without compensating virtues, "that it does not find to be adverse to the public interest, or in violation of this chapter." *Id.* § 1382(a)(2)(A).

Although the "public interest" standard is vague and subject to Board interpretation, and although the "violation of this chapter" standard is wide-ranging, both aspects of the test of a multicarrier agreement are given focus elsewhere in the Act. Thus section 102 of the Act, 49 U.S.C. § 1302 (Supp. V 1981), provides a long list of goals as being in the public interest, section 404, *id.* § 1374 (1976 & Supp. V 1981), prohibits carrier practices that are unduly preferential or prejudicial, and section 1002(j)(5), *id.* § 1482(j)(5), specifies factors the Board must take into account in determining the lawfulness of an international rate. *See also* Brief for Respondent in No. 83–1939, at 6–7 (citing these sections).

In an order issued shortly before those under review here, the Board explicitly acknowledged these statutory constraints and purported to follow them. "In evaluating IATA rate agreements, the chief factor in the public interest determination is the economic effect of the proposed rates. The lawfulness of rates is governed by the rate-

making standards in section 1002 ..., which include such concepts as unreasonableness, unjust discrimination, and undue preference or prejudice." CAB Order 83–7–51, at 4 (July 14, 1983), JA at 66. References to these ratemaking criteria in the orders we review, however, are oblique at best.

 Other than describing the rate agreement and the limits of the Board's approval, *see supra* pp. 1527–1528, the first of the orders we review simply stated: "We do not find that the following resolutions ... are adverse to the public interest or in violation of the Act ...." CAB Order 83–8–49, at 2 (Aug. 10, 1983), JA at 29. This repetition of statutory standards without any attempt to explain why the rates satisfy them is patently inadequate. Such unreasoned agency action is arbitrary and must be vacated. *See Pan American World Airways v. CAB*, 261 F.2d 754, 757 (D.C.Cir.1958) ("The Board 'must find what the statute requires it to find, not in conclusory fashion in the statutory language but in such fashion that a reviewing court can test the validity of the finding.'" (quoting *American Airlines v. CAB*, 235 F.2d 845, 853 (D.C.Cir.1956), *cert. denied*, 353 U.S. 905, 77 S.Ct. 668, 1 L.Ed.2d 666 (1957))), *cert. denied*, 359 U.S. 912, 79 S.Ct. 590, 3 L.Ed.2d 575 (1959). This is true even though the Board received no opposition to the agreement; the Board's statutory obligation to determine the lawfulness of the rates remained the same, although the Board obviously can explain its reasons far more concisely in a case where no opposition is heard than in one hotly contested.[13]

The second order under review here, issued on petition for stay and reconsidera-

---

**13.** The Electronics Shippers cite for this proposition *Calvert Cliffs' Coordinating Comm., Inc. v. United States AEC,* 449 F.2d 1109, 1118–19 (D.C. Cir.1971), which in turn was followed in *Aeschliman v. United States NRC,* 547 F.2d 622, 627 (D.C.Cir.1976), one of the cases overturned by *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). *Vermont Yankee* thus calls into question the Shippers'

support and consequently the proposition. This case differs from *Vermont Yankee,* however.

There the Supreme Court considered the National Environmental Policy Act's requirement of "a detailed statement by the responsible official on ... alternatives to the proposed action." 42 U.S.C. § 4332(C), *quoted in Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215. This court had held that the NRC was obligated under the Act to investigate any alternative raised by an intervenor in such a way as to stimulate the Commis-

tion of the first, does little more to relate the particular rates under review to the statutory standards of review, although it does make occasional references to reasonableness and discrimination. The crux of the Board's decisions is as follows: "We concluded [in the initial review], on the basis of competition and the carriers' need for revenue improvement indicated by Form 41 reports, that further [economic] justification was not necessary for our approval of rates within the SFRL ceiling." CAB Order 83–10–32, at 10 (Oct. 6, 1983), JA at 44. The Board then discussed why only rates below the ceiling were approved, and reaffirmed its findings that the IATA agreement, so limited, "is not adverse to the public interest or in violation of the Act." *Id.* at 11, JA at 45. The crucial question we must decide, then, is whether the Board's discussion of competition and revenue needs served adequately to canvass the relevant factors.

## B. *Reliance on Competition*

The Board unabashedly placed great reliance on the zone of flexibility established in PS–109, even though PS–109 stated that the Board "continue[s] to expect all multicarrier agreements to be economically justified," 48 Fed.Reg. at 4278. The Board explained later, however, that PS–109 only declined to grant *automatic* approval to IATA rates within the zone, but did not foreclose use of the zone as an analytical tool. CAB Order 83–10–32, at 9, JA at 43.

Although the rates would not be approved automatically, the fact that they fall in the zone, according to PS–109, is "often of relevance to the degree of justification and review necessary under" the Act. 48 Fed. Reg. at 4278. Beyond certain minimal amounts, "the precise nature and scope of information ... will be the responsibility of the participating carriers in the first instance." *Id.*

■■■ That is, perhaps, a plausible interpretation of PS–109's discussion of multicarrier agreements, but it is not a plausible description of how the Board actually used the zone of flexibility in this case. The Board claimed to have relied not on PS–109 directly, "but on the continued vitality of the competitive factors noted in that policy statement." CAB Order 83–10–32, at 10, JA at 44. That cannot be correct, however, for the existence of competition alone, according to the Board, does not establish the reasonableness of any rate; otherwise, no rate ceilings would be necessary in competitive markets. In this case, moreover, the IATA carriers did not submit any economic justification for the rate agreement. In the absence of any explicit attempt to justify the agreement, PS–109's zone was perforce more than "of relevance" to the Board's review; in effect it was conclusive, and the Board virtually admitted as much. Its order stated "the ceiling defines a zone of presumptive reasonableness where there is competition in the market.... In this case, we have found that the multicarrier

---

sion's interest. *See Aeschliman,* 547 F.2d at 627–28. The Supreme Court rejected this view, stating that an agency need not "ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." 435 U.S. at 551, 98 S.Ct. at 1215.

In *Vermont Yankee,* as in our case, the statute required the agency to undertake an investigation. Arguably, therefore, we cannot require the CAB to consider things not brought to its attention by interested parties. The statutes differ, however, in that the Federal Aviation Act, unlike the NEPA, is explicit in the matters the Board must consider. The Board is not dependent on outsiders to propose the factors relevant to decision. Although the Board is left with

some discretion to determine the information it will require of carriers and the manner in which it will proceed in order to evaluate a rate agreement in light of this statutory directive, *see infra* pp. 1540–1543, it still must make findings that do more than parrot the Act conclusorily. It is a matter of simple logic, moreover, that its findings will have to be more detailed when they confront the contentions of intervenors who have "structure[d] their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vermont Yankee,* 435 U.S. at 553, 98 S.Ct. at 1216.

agreement has not undermined competition, and the shippers have presented no other evidence that the rates within the SFRL zone are unreasonable." *Id.* at 9, JA at 43. Thus the "continued vitality of the competitive factors" was relevant solely because PS–109 was used directly to establish a presumption of reasonableness that could be rebutted only by showing a deterioration of competition or other economic data.

■ This use of the zone to establish directly the lawfulness of a rate, as opposed to the need for suspension, does not accord with the Board's statutory duties. In order to approve an IATA rate agreement, the Board must determine that the agreement is in the public interest and is not in violation of the ratemaking criteria of the Federal Aviation Act. *See supra* pp. 1537–1538. At no time has the Board ever attempted to demonstrate that the agreement in question meets these standards.

It is clear that in formulating PS–109 the Board did not demonstrate that the referent rates were economically justified. PS–109 states that "this policy will not finally determine whether any rate within the zone is reasonable." 48 Fed.Reg. at 4272. The Board made no effort to determine whether any of the rates encompassed by the zone were actually just and reasonable. The Board chose as base rates those in effect on April 1, 1982, not because they were reasonable, but "primarily because relatively competitive conditions prevailed in most major cargo markets during the preceding year," *id.* at 4276. Indeed, the Board rejected the request of two commenters that it not select a base date without first determining whether rates then in effect were economically reasonable. It found that investigating rate reasonableness "would be a fruitless and unnecessary exercise in connection with a suspension-free zone, which is not intended to define conclusively whether any rate is reasonable." *Id.*

The orders approving the IATA agreement do no more to show that any rate within the zone, let alone the particular rates set by the agreement, satisfy the statutory criteria. The Board simply asserted that the competition in the Pacific it found in earlier proceedings still obtained, but those findings were not supported by any analysis of the legality of any particular rates. Although it may be that competition regulates rates in the Pacific, the Board did not show how competition forces rates to meet the statutory criteria.[14]

■ Thus the Board's use of PS–109 in the IATA orders is unlawful in two respects. First, it is arbitrary and capricious to use the zone to establish the reasonableness of the rates within it when those rates were never found to be reasonable and when the zone was not created for that purpose. Second, the Board exceeded the scope of its authority in approving the IATA agreement because the Federal Aviation Act requires that the Board make certain findings before it approves a multicarrier rate agreement, yet the zone of flexibility was not premised on any of those findings and none were made when considering the IATA agreement. Accordingly, the Board's reliance on PS–109 and on competition to support approval of the IATA agreement was not justified and,

---

**14.** The Electronics Shippers argue that a multicarrier rate agreement is inherently anticompetitive, and that the Board must evaluate the impact of such collusion on its previous findings of effective competition. They also claim that the Board concluded in PS–109 that multicarrier agreements undercut competition in the Pacific, that it must therefore explain any contrary conclusions now, and that it has not done so.

The Board answers that IATA is an ineffective cartel in the Pacific, and that non-IATA carriers maintain effective competition there. It says that PS–109 concluded only that multicarrier agreements *could* affect competition and therefore were not entitled to automatic approval, but rather would have to be evaluated on a case-by-case basis. In this case, the Board found competition unimpaired and accordingly approved the agreement.

We need not resolve this dispute in view of our conclusion that whatever the state of competition, the Board never demonstrated the IATA rates to be lawful under the statutory criteria.

standing alone, warrants vacating and remanding the order.

The parties have expounded at considerable length on the question of whether the Board may ever rely on competition to determine the reasonableness of rates. Although we need not decide the issue, discussing it now will help clarify what we do decide.

The Supreme Court, and this court in its wake, have sanctioned reliance on the market to substitute for some degree of regulatory control in certain circumstances. *See FCC v. WNCN Listeners Guild*, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981); *Wold Communications, Inc. v. FCC*, 735 F.2d 1465, 1475 (D.C.Cir.1984); *Office of Communication of the United Church of Christ v. FCC*, 707 F.2d 1413, 1434–38 (D.C.Cir.1983); *Computer & Communications Industry Association v. FCC*, 693 F.2d 198, 212 (D.C.Cir.1982), *cert. denied*, 461 U.S. 938, 103 S.Ct. 2109, 77 L.Ed.2d 313 (1983). These cases all involved an agency operating subject to a "public interest" standard, a standard not significantly more restrictive of discretion than "just and reasonable," and they might therefore support CAB reliance on competition. Some of the other ratemaking criteria in 49 U.S.C. § 1482(j)(5) are more explicit and less subject to Board interpretation, however. Because analogous restrictions were not present in the cases cited above, they are not fully supportive of the CAB's authority to substitute market for regulatory discipline.

Recently a panel of this court noted that "[m]oving from heavy to lighthanded regulation within the boundaries set by an unchanged statute can, of course, be justified by a showing that under current circumstances the goals and purposes of the statute will be accomplished through substantially less regulatory oversight." *Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486, 1510 (D.C.Cir.1984) (citing *Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 413 (D.C.Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 3545, 82 L.Ed.2d 848 (1984)). The Electronics Shippers would find this remark inapposite in the present case, for the statute not only is unchanged, but, in abandoning H.R. 5882, Congress deliberately eschewed the course now advanced by the CAB. Conversely, the CAB argues that the statute has changed. Most importantly, IATCA (*see supra* p. 1523) made applicable to international air transportation the injunctions to find in the public interest the "placement of maximum reliance on competitive market forces and on actual and potential competition" and the "encouragement, development, and maintenance of an air transportation system relying on actual and potential competition." 49 U.S.C. § 1302(a)(4), (9) (Supp. V 1981).

Not surprisingly, both positions are overstated. We turn first to the Shippers' argument. The general rule is that congressional inaction or congressional action short of the enactment of positive law, like postenactment legislative history, is often entitled to no weight in construing a statute. *See* Easterbrook, *Statutes' Domains*, 50 U.Chi.L.Rev. 533, 537–39 (1983). There are times when informal congressional approval of an agency's construction of a statute is taken as relevant evidence of original legislative intent. *See Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 2032–34, 76 L.Ed.2d 157 (1983); Sunstein, *Deregulation and the Hard-Look Doctrine*, 1983 Sup.Ct.Rev. 177, 198 & n. 96 (citing cases). But regulatory agencies are not expected to cast their rules in stone; "they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy." *American Trucking Associations, Inc. v. Atchison, T. & S.F. Ry.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). Inaction by Congress is due generally to reasons too diffuse, ephemeral, and ultimately unaccountable for it to confine this process of

regulatory adaptation to changing circumstances.

■ In considering H.R. 5882, Congress may have been trying to compel the CAB to do what otherwise would have been a matter of agency discretion. Congress may have chosen not to act on the measure when the CAB said it would attempt to solve the perceived problem administratively. The Electronics Shippers placed in the record a statement from a Representative to contrary effect, but one voice cannot speak conclusively for the whole body. In any event, we just cannot be sure. As the Supreme Court said in *American Trucking*, "[t]he advocacy of legislation by an administrative agency—and even the assertion of the need for it to accomplish a desired result—is an unsure and unreliable, and not a highly desirable, guide to statutory construction." 387 U.S. at 418, 87 S.Ct. at 1619. In that case, the Court held that Congress's failure to enact legislation proposed by the agency did not preclude analogous rulemaking. *Id.* at 416–18, 87 S.Ct. at 1618–19. It would be even less appropriate here, where the CAB asserted to Congress its ability to reach these goals without legislation, for us to construe Congress's inaction to have greater effect than it did in *American Trucking*. Thus Congress's failure to adopt H.R. 5882's zone of reasonableness does not prevent the CAB from considering its ability to reach a similar result through rulemaking.

By the same token, we should not read too much into IATCA's extension to international transportation of the procompetitive goals added by the Airline Deregulation Act. Those policy goals cannot be taken *ex proprio vigore* to direct the CAB to abandon traditional ratemaking analysis in favor of a zone of reasonableness. For one thing, that would amount to an implied repeal of the ratemaking criteria, which is a form of statutory construction courts typically avoid. *See, e.g.,* *TVA v. Hill,* 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978). For another, that

construction is inconsistent with the rest of IATCA, which created a zone of reasonableness for international passenger transportation but left international cargo unchanged. Apparently Congress believed it was necessary to do more than enunciate policy goals in order to require the creation of the zone of reasonableness. If the policy statements did not mandate the change for passengers, they did not do so for cargo. *Cf.* Keyes, *A Comparison of Two Proposals for Regulatory Change,* 41 J.Air.L. & Com. 727, 736 (1975) (similar policy statement in proposed Aviation Act of 1975 not likely to be interpreted to compel unfettered market entry in view of fact that Act singled out particular markets to be subject to open entry).

■ In short, the new policy goals restrain us from holding that under no circumstances could the CAB rely on competition to aid in ratemaking, but they do not preempt the fundamental requirement of administrative law that "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) (footnote omitted), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). *See also Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (when agency changes course it must "supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance").

It is with respect to this principle that we find the CAB to have failed. In promulgating PS–109, it "failed to show that the rates resulting from its newly articulated ratemaking principles would necessarily satisfy the 'just and reasonable' standard." *Farmers Union,* 734 F.2d at 1510. This gap was not filled when the CAB used the zone to approve the IATA rate agreement,

and its approval is thus not in accordance with law. This is not to say that the CAB could not decide to rely on competition to patrol rates, but only that if it should choose to do so it must demonstrate through its factual record and legal reasoning that its choice is consistent with its statutory obligations. *Cf. Brae Corp. v. United States*, 740 F.2d 1023 (D.C.Cir.1984) (affirming in part, vacating in part ICC deregulation of boxcars); *id.* at 1036–1044 (upholding reliance on competition to justify boxcar exemption from rate regulation). *See generally* Sunstein, *supra* p. 1541, at 204–06 (discussing standard agencies must meet to deregulate and ways they can do so).

## C. *The Carriers' Revenue Needs*

The Board approved the rate agreement, to the extent that the rates were within the zone established by PS–109, not only because of competition, but because of "the carriers' need for revenue improvement indicated by Form 41 reports." CAB Order 83–10–32, at 10, JA at 44. The only other reference to this data was the statement that the carriers showed, for the year ending March 31, 1983, "an operating profit of only 4.5 percent on Flying Tiger's transpacific cargo revenues, and a return on investment of 7.3 percent, well below our traditional ratemaking ROI standard." *Id.* at 5–6, JA at 39–40. According to the Board, these data "corroborated" its findings based on competition. Brief for Respondent in No. 83–1939, at 41. We conclude, however, that the rate approval was arbitrary and not in accordance with law because the data were wholly inadequate to the task, and they were presented without explanation or shred of analysis.

There are four defects in the Board's attempt at economic justification. First, as the Board concedes in its brief, the 7.3% figure does not appear on Form 41 itself but rather is a result of certain Board calculations. *Id.* at 43–44. These calcula-

tions, which the Board claims in its brief are routine, *id.*, are nowhere mentioned in the order, which tends to dispel any notion that the Board's numbers were the product of reasoned analysis. The Electronics Shippers, moreover, claim to be unable to replicate the Board's figures. Reply Brief of Petitioners in No. 83–1939, at 13. This, too, is a cause for some concern. While we do not want to lay down a rule that the Board must accompany every rate order with every calculation underlying it, particularly if the calculations are routine, it was error for the Board not to advert to the data and methods of calculation it used in such a way as to allow rate opponents and reviewing courts to understand how the Board reached its conclusions.

Second, the Board failed to calculate separate rates of return for scheduled and charter cargo service, and it failed to separate out Flying Tigers's charter passenger service. According to the Board, cargo charters accounted for 9.8% of Flying Tigers's transpacific revenue ton-miles (RTM's), Brief for Respondent in No. 83–1939, at 44 n. 12, and according to the Electronics Shippers, passenger charters accounted for another 9% of the RTM's, Reply Brief of Petitioners in No. 83–1939, at 13. Thus nearly 20% of Flying Tigers's RTM's across the Pacific were charters, yet the Board made no attempt to determine their effect on return on investment. This was arbitrary and capricious. The Board now says that whatever effect charters may have, it is too small to alter the conclusion of rate reasonableness. Brief for Respondent in No. 83–1939, at 44. But the Board never attempted to relate the proposed rate increases to the projected rate of return, *infra* p. 1544. Without having estimated how much the rate of return is likely to increase, we have no idea how the Board can make any assertions about the relative impact of 20% of Flying Tigers's RTM's on that estimate.

Third, the Board relied solely on Flying Tigers's data and never looked at data for

the three other United States carriers [15] who were parties to the agreement. It explains that omission now by saying that "cargo data for [those] carriers is not readily available," that is, the data "cannot be readily derived from Form 41 data." Brief for Respondent in No. 83–1939, at 45. But the Board should have requested rate of return data for the other carriers, as it has done for years. *See, e.g.,* CAB Order 82–9–14 (Sept. 3, 1982), JA at 100. Its explanation for its failure to have done so is utterly irrational. The explanation follows.

Flying Tigers's operations are almost exclusively all-cargo, which permits one to derive valid rates of return from its Form 41. Only one other U.S. carrier has all-cargo flights. Because Flying Tigers "is clearly the larger [all-]cargo operator, Flying Tiger's [sic] figures would be of great weight in any analysis." Brief for Respondent in No. 83–1939, at 46. The Board omits from this the fact that the other carrier with all-cargo operations, Northwest Orient, was not a party to the agreement and did not seek approval of the rates in question. *Id.* at 45 n. 14. The other U.S. IATA cargo carriers, moreover, send cargo in the bellies of passenger craft, and the Board has frequently noted that such combination flights produce much higher rates of return to cargo than do all-cargo flights. *See, e.g., Hearing, supra* p. 1524, at 9 (testimony of CAB Member Bailey) ("[W]hen we are looking at what a reasonable rate is for cargo we use all-cargo carriage as the standard.... [U]sing the unused belly capacity of a cargo passenger flight ... is much cheaper to operate, and if you are taking the all-cargo rate you can earn a high rate of return ...."); *id.* (Bailey testimony) (combination craft cost "much less because the plane is already flying the passengers, and anything you can put in the belly is just essentially gravy for you, whereas, if you are an all-cargo plane you have to make your rate of return off the cargo you are carrying"). In a rational world, the rate of return to cargo for an all-cargo carrier like Flying Tigers would be irrelevant, not "of great weight," in a ratemaking analysis for combination carriers. Although Flying Tigers is the principal U.S. IATA cargo carrier, the other three (Pan American, United, and Continental) amount for over 25% of transpacific cargo RTM's covered by the agreement. *See* Brief for Respondent in No. 83–1939, App.B. Omission of any analysis of their rates of return therefore was not negligible, but highly arbitrary.

Finally, even if it were rational to rely on Flying Tigers's data alone, the Board made no attempt to evaluate the effect of the proposed rate increases on Flying Tigers's projected rate of return. Even if the record adequately demonstrated *that* carrier's need for "revenue improvement," the record nowhere considers whether the rate increase requested was excessive compared to the need. The Board does not explain this omission. We are unable to conclude that the Board's analysis, without any projection of rates of return under the new cargo rates, is in accord with its statutory duty to determine whether the rates are, inter alia, just and reasonable.

For the four reasons just discussed, we conclude that the Board's economic analysis was not legally sufficient to support its approval of the IATA agreement.

## D. *The Remand*

Because we have found the Board's actions with respect to the IATA rate agreement arbitrary, capricious, and not in accordance with law, we must vacate and

---

**15.** The Board is not entitled to the same information from foreign carriers as it is from domestic carriers, and different accounting practices make it difficult to use what data it can get. Thus domestic carriers' rates of return are used in determining whether to approve an IATA rate agreement. *Cf. Hearing, supra* p. 1524, at 8 (testimony of John Kiser, CAB International Fares and Rates Division) ("[T]he IATA agreements in many areas had no U.S. carrier parties [s]o we really had no basis in terms of U.S. carrier costs to approve" them.).

remand CAB Orders 83–8–49 and 83–10–32, at least insofar as they approve the IATA agreement and confer antitrust immunity. During the proceedings that will ensue upon remand, two issues litigated here are likely to arise again, and we should therefore address them now.

First, the Electronics Shippers challenge the burdens of proof utilized by the Board thus far. They argue that the carriers must be required to produce cost justifications, including historical and projected cost and revenue data, for the proposed new rates. The Board resists this argument, relying primarily on its construction of PS–109.

In the reconsideration order, the Board rejected the Shippers' argument that approval of the rate agreement "is invalid in the absence of carrier economic justification" because it is "based on a misreading of the SFRL policy statement." CAB Order 83–10–32, at 9, JA at 43. According to the Board, the statement required only that IATA submit certain descriptive material, and IATA had complied with that requirement. *Id.* at 9–10, JA at 43–44. Any economic justification beyond that, however, "is the responsibility of the participating carriers, individually or jointly." *Id.* at 10, JA at 44. The Board stated that if, as in the case under review, no economic data are presented, it has three options: reject the agreement, require economic justifications to be submitted, or rely on other data already available to approve the agreement in whole or in part. *Id.* The CAB followed the last course here. *Id.* at 10–11, JA at 44–45. In its brief to this court, the Board reiterates that economic justifications were not necessary because "the Board made its determination ... on the basis of competition supported by public data." Brief for Respondent in No. 83–1939, at 49. Economic data had been required of IATA carriers in the past only "because the Board has historically relied on rate analysis, not competition, to test rates." *Id.*

We have concluded that the Board's reliance in this case on competition and other data was improper. As just seen, the Board has conceded in its brief that in the past, when it has not relied on those factors, it has considered it necessary to have greater economic justification than was presented here in order to conduct a rate analysis. On remand, therefore, the Board either should require the carriers to submit economic justifications for the proposed rates, or it should provide a carefully reasoned and factually supported explanation for any departure from past practice.

The other remaining issue concerns the focus of the rate inquiry. The Electronics Shippers contend that the Board must undertake a pricing study to determine the relative importance of space and weight to carrier costs. Cargo rates now are based primarily on weight. The Shippers believe that space is a more serious constraint on carriers but is inadequately accounted for in the rate structure. As a result, they argue, they are disadvantaged, since electronics shipments are relatively small and dense. The Board rejected the Shippers' request for such a cost allocation study, resting the rejection on its explanations for rejecting similar requests in the past and on its conclusion that electronics SCR's are priced competitively, below comparable GCR's, and that this demonstrates adequately that electronics shipments are not discriminated against. CAB Order 83–10–32, at 11, JA at 45.

On the whole, we find the Board's resolution is reasonable. We note that this court has before sanctioned an analogous Board decision to approve rates that were not tied exclusively to fully allocated costs. *See National Air Carrier Association v. CAB,* 442 F.2d 862, 871 (D.C.Cir.1971). The thrust of the Shippers' argument against the Board's decision here is that "this is a factual issue which can be determined only after the Board has obtained all the necessary facts from the carriers." Reply Brief of Petitioners in No. 83–1939, at 22. The Board, however, has adduced factual considerations other than the ship-

ment's density (e.g., length of flight, density of other shipments on the flight, value of service to customer) to explain why the rates may be reasonable and nondiscriminatory. CAB Order 83–7–51, at 13 (July 14, 1983), JA at 75, *cited in* CAB Order 83–10–32, at 11, JA at 45. At the same time the Shippers have not overcome the powerful inference to be drawn against their cause from the fact that, although they claim that electronics SCR's are discriminatory and in effect are higher than comparable GCR's, *see* Brief for Petitioners in No. 83–1939, at 34, they continue to ship their goods at the SCR and not the GCR. It is inexplicable that they would not take advantage of the GCR if it were truly lower. This inference of course does not prove that the electronics SCR's are reasonable, not discriminatory, or priced according to fully allocated costs, but it does suggest that the Board was reasonable in requiring a greater showing from the Electronics Shippers before it embarked on a massive and unprecedented cost allocation study.

## IV

The Board's decision not to suspend international cargo rates within a certain range of rates is reasonable and not contrary to statute. Our decision to approve the no-suspension policy depended, however, upon certain assumptions about how the policy would be implemented. These assumptions were based on a straightforward reading of the policy and on the Board's representations in its Brief to this court. We are troubled by the fact that the Board acted upon the IATA rate agreement in a manner inconsistent with its representations in PS–109 and to us. These actions make us more wary that, contrary to our understanding of it, the no-suspension policy will in practice lead to an irrebuttable presumption of the reasonableness, and hence to the automatic approval, of all rates within the zone.

Agency action comes to us with a presumption of regularity, however, and we will not infer a pattern of irregularity from this one decision. As another panel of this court stated in analogous circumstances, "we can only assume that the [agency] will follow the statute in deciding whether to investigate" and, we might add, in deciding whether to approve rates. *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 724 (D.C.Cir.1984). Thus the parade of horribles that the Electronics Shippers predict will result from implementation of the no-suspension policy, if in fact it does result, will have to be dealt with in future litigation. Our decision in No. 83–1939 should stand as a warning to the Board that abuse of the policy, such as that involving the IATA agreement, will not be tolerated.

*It is so ordered.*